**In the Matter of BOSTON AND PROVIDENCE RAILROAD CORPORATION.**

**Bankruptcy No. 62413.**

United States District Court,
D. Massachusetts.

March 1, 1983.

---

Armistead B. Rood, Washington, D.C., Joseph B. Hyman, Arlington, Va., Albert B. Wolfe, Cambridge, Mass., for Boston & Providence Development Group.

Arthur P. Schmidt, Charge Trustee, Charles W. Bartlett, Organization Trustee, Gaston Snow and Ely Bartlett, Boston, Mass., for Shawmut Bank of Boston;

Charles W. Mulcahey, Boston, Mass., Counsel for Organization Trustee.

Edwin K. Taylor, Associate Gen. Counsel, Penn Central Corp., New York City, John E. Vanderstar, Covington & Burling, Washington, D.C., Harris G. Gorab, John M. Hall, Choate, Hall & Stewart, Boston, Mass., for Penn Central Corp.

## MEMORANDUM

CAFFREY, Chief Judge.

This matter is before the Court on remand from the Court of Appeals for the First Circuit. *In the Matter of Boston & Providence Railroad Corp.*, 673 F.2d 11 (1982). In its opinion, the Court of Appeals directed this Court to set forth its evaluation and analysis of the proposed compromise settlement in the record. Herewith that analysis.

In February, 1981 the Charge Trustee petitioned this Court for authority to settle outstanding claims for the benefit of holders of certificates of contingent beneficial interest (CCBI's), and for final discharge of the Shawmut Bank from further objections and liability as trustee.

In support of his petition to effect a final wind up the Boston & Providence Railroad Corp. (B & P) Reorganization, the Charge Trustee provided the Court with a recital of alleged facts and supporting affidavits which may be summarized by the Court as follows.

The lien of the equitable charge created by the original Indenture of equitable charge expired on December 31, 1978. Charge Trustee claims that at all times before and after that date, he has acted diligently to recover all monies which might be or become owing and payable to him for distribution to CCBI holders according to the terms of the Indenture.

One major recovery and distribution within the contemplation of the Indenture was effected in 1973, pursuant to order of the United States District Court for the Eastern District of Pennsylvania, as a result of the transfer of the former B & P properties located in Massachusetts by the trustees of the property of the Penn Central Transportation Company (PCTC). Charge Trustee alleges that two further transfers of former B & P properties have occurred in circumstances possibly falling within the scope of the Indenture which, only if they should in all respects be decided favorably to the Charge Trustee, would result in further benefit to CCBI holders. These are the transfer in 1976 of the Providence Union Station to the State of Rhode Island pursuant to the Regional Rail Reorganization Act of 1973, as amended, (Rail Act) and pursuant to the Final System Plan (FSP) adopted thereunder, and the transfers of sundry other parcels of former B & P real estate on October 24, 1978 in the course of the consummation of the Plan of Reorganization of PCTC.

The Charge Trustee claims that he has asserted and continues to assert in the Court exercising jurisdiction over the PCTC his claims of entitlement to receive payments benefiting CCBI holders on account of the 1976 and 1978 transfers. And, according to the Charge Trustee, the Penn Central Corporation (Penn Central), immediate successor to the trustees of the property of PCTC, has always disputed and continues to dispute the Charge Trustee's claims. The Charge Trustee claims that it would be prudent, fair, and reasonable, under the circumstances, and in the best interests of CCBI holders, to forego further litigation and, with the approval and authorization of this Court, to enter into a full settlement with Penn Central of all outstanding claims of the Charge Trustee which might benefit CCBI holders under the Indenture.

The amount of the proposed settlement is $350,182.20 for distribution only to CCBI holders (public holders) other than Penn Central. This amount represents funds to be distributed to those holders at the rate of $16.86 for each of the 20,770 former shares of B & P stock represented by the certificates held by the public holders.

Charge Trustee claims that such settlement and distribution will fully dispose of all issues and claims of concern to CCBI

634

holders with respect to the Indenture and accordingly the Indenture should be terminated and discharged and the Charge Trustee should be finally and fully discharged.

In his supporting affidavit of February, 1981, the Charge Trustee detailed what he believes to be the outstanding and unresolved claims against Penn Central by the CCBI holders under the Indenture. They are summarized by the Court as follows.

The outstanding claims which would be compromised and settled with the approval of this Court are three in number, referred to as the Station Claim, the Severance Damage Claim, and the Consummation Claim.

I. The *Station Claim* is based upon the Charge Trustee's interpretation of a portion of the *quasi cy pres* concept established by the Honorable John P. Fullam's memorandum dated March 22, 1978 accompanying Order No. 3470 of the United States District Court for the Eastern District of Pennsylvania (Philadelphia Court) in the matter of Penn Central Transportation Company, Debtor in Proceedings for the Reorganization of a Railroad, Bky. No. 70–347. Judge Fullam's memorandum made plain that he was prepared to enter final judgment declaring that the Charge Trustee and CCBI holders are *not* entitled by the terms of the Indenture to share in the proceeds of former B & P real estate conveyed by the trustees of the property of the PC trustees on April 1, 1976 pursuant to the Rail Act of 1973. Nevertheless, Judge Fullam recognized a certain equity in the Charge Trustee's claim to such sharing and in deference thereto announced a *quasi cy pres* concept. The relevant portion of that concept is understood to permit the Charge Trustee to share in proceeds of any property transferred under the Rail Act for which the then Debtor's estate, Penn Central, might receive an award of at least $500,000 (the minimum amount required by the Indenture in order for CCBI holders to benefit from any transaction in B & P property) all provided that such property was devoted to other than the long haul rail service (hereinafter called rail use contemplated by Section 5 of Article I of the Indenture). The Charge Trustee claims that he has always asserted that the Rail Act events affecting the station entitle the Charge Trustee to receive payment of its proceeds for the benefit of CCBI holders. Penn Central has always denied the Charge Trustee's claim and the issue remains pending without decision in the Philadelphia Court. The Station Claim is asserted by the Charge Trustee to have a gross potential of $730,000. If the chances of successful litigation of this claim are about fifty percent (see discussion at 639–640, *infra*) then a settlement figure of $365,000 would be a reasonable and acceptable compromise.

II. The *Severance Damage Claim* rests upon the Charge Trustee's interpretation of a brief passage in Judge Fullam's memorandum and upon the rule of law that upon a partial taking of property by eminent domain the owner of the property is entitled to recover damages for any injury to his remaining property suffered by reason of the severance worked by the partial taking. The extent of any such damage has not been determined, although the Charge Trustee claims that with respect to certain downtown Providence properties one appraiser has concluded that no severance damage was occasioned by the Rail Act transfer of adjacent parcels. The circumstances affecting these parcels are not necessarily identical to those affecting other remaining parcels, of course. Penn Central contests this claim by the Charge Trustee and it remains pending without decision in the Philadelphia Court. The Severance Damage Claim, according to the Charge Trustee's second supplemental memorandum, has a potential worth not exceeding $50,000 to $60,000. With a fifty percent chance of success in litigation (see discussion at 639–640, *infra*), $30,000 for settlement of the claim would be a reasonable compromise.

III. The *Consummation Claim* is based on the October 24, 1978 transfer of the former B & P properties then held by the PC trustees from them to Penn Central and the transfers by Penn Central by way of

mortgage, all in consummation of the PCTC Plan of Reorganization. Penn Central likewise contests this claim of the Charge Trustee, and like the others this claim remains pending without decision in the Philadelphia Court. According to the Charge Trustee, the Consummation claim has a potential gross value of $1 million. If the chance of successful litigation of this claim, as with the others, is fifty percent, a settlement figure of $500,000 is a reasonable and acceptable compromise.

The Charge Trustee asserts that assuming every issue involved in each of these claims were decided favorably to the Charge Trustee, the gross recovery might be $1.8 million. As stated above, the Station Claim is asserted by the Charge Trustee to have a gross potential of $730,000; the Severance Damage Claim, a potential worth not exceeding $50,000 to $60,000; and the Consummation Claim a potential gross value of $1 million.

The Charge Trustee claims that a compromise settlement of approximately one-half that amount, or $900,000, is prudent and reasonable in light of the delays, cost, and uncertainty of litigation and the costs of subsequent appeal. All unsettled disputes in this case would go to arbitration, of course, according to the terms of the Indenture. As to the $900,000 proposed settlement the breakdown would be as follows.

Under the Indenture formula, Penn Central is entitled to deduct from the gross proceeds of a transaction amounts not previously recovered in reimbursement of its outlays for compensation and expenses of the Charge Trustee and the director of development. These now cover a period from 1973 and are claimed to exceed $270,000. In addition, Penn Central as holder of 48.-075 percent in interest of the CCBI's is entitled to its proportionate part of Net Proceeds remaining after the permitted deductions, leaving something slightly over $300,000 for the public holders.

Based upon the Charge Trustees recommendations and supporting affidavit, this Court issued findings that approved the proposed compromise as prudent, fair, and equitable and ordered the trustee discharged. *In Proceedings for the Reorganization of A Railroad,* Findings and Order, April 10, 1981.

Upon appeal to the Court of Appeals for the First Circuit the matter was remanded to the District Court for a more detailed analysis of the fairness and equity of the proposed $900,000 settlement. *In the Matter of Boston & Providence Railroad Corp.,* 673 F.2d 11 (1982).

Pursuant to the remand, the Charge Trustee submitted three additional memoranda, dated May 10, 1982, which further elaborate upon issues supporting the proposed settlement. The first of these memoranda analyzes the legal questions that would have to be resolved favorably to the Charge Trustee were litigation to ensue on the three claims. The third memorandum supplements the first by further detailing the legal obstacles to a successful conclusion of such litigation. The second memorandum reviews and explains the Indenture Formula as it relates to the fairness and equity of the proposed settlement. The Indenture Formula provided for in various articles of the Indenture, it is to be recalled, directs that certain deductions be made from gross proceeds in arriving at the net proceeds which are to be distributed to public CCBI holders under the proposed settlement.

A number of the legal issues involved in the resolution of the three outstanding claims and set forth in the May 10, 1982 memoranda are summarized by this Court as follows.

There are certain considerations common to all three claims. The first is that in order to afford any prospect of CCBI holder benefit, a claim must satisfy both the requirements of the Indenture and of the Plan, which is incorporated in the Indenture. These are: (1) that an event must occur or be contracted for not later than December 31, 1978 which; (2) constitutes a conveyance as defined in Article I, Section 5 of the Indenture, and; (3) involves receipt by the Grantor of at least $500,000 in compensation. In only those circumstances

does Article III of the Indenture provide that the Grantor receive those proceeds in trust for payment to the Charge Trustee for *pro rata* distribution to the CCBI holders. The proceeds moving in that chain are intended to be net of certain expenses recoverable by the Grantor out of gross proceeds, as permitted by Article I, Section 8 of the Indenture. It is to be noted, too, that the Grantor holds nearly 50 percent of the CCBI's and that, accordingly, the Charge Trustee may be deemed to be concerned primarily with benefit to the other holders, commonly called the public holders.

A second consideration common to all claims is that a "Conveyance", as defined, is: (1) any transfer of ownership of former B & P real estate; (2) free and clear of the lien of the equitable charge; (3) to a grantee for its non-rail use. Grantees taking for rail use are required by the Indenture to receive the property subject to the equitable charge and to assume the Indenture obligations of the Grantor. Nothing becomes payable to the Charge Trustee in those cases. Rail use is the long-haul passenger or freight service which the B & P once performed between Boston and Providence or farther westward; non-rail use includes any use not related to railroading and also any rail service not of the long-haul variety, such as local commuter or local freight service.

## I. *The Station Claim*

The Providence Union Station, in Providence, Rhode Island, according to the Charge Trustee, was historically owned in part by the New Haven. Its easterly half was owned by the B & P. The term Station Complex is not always an exact term but, as used by the Charge Trustee, it usually means the easterly portion of the bridge over Francis Street and approximately 99,-000 square feet of land abutting to the east, together with half the Station building, the former Railway Express building, and other related structures on that land, which in the railroad Val Plans was known as parcels H–1 and H–2. Sometimes the term is used to include all of the Station.

In April, 1976 Penn Central Trustees transferred properties to Conrail pursuant to the Rail Act of 1973 as amended and the FSP, the latter identifying the properties to be included in the transfer. Following this Conrail Transfer, the Charge Trustee asserted its claim, at first in this Court and then in the Philadelphia Court, that the CCBI holders were entitled to the Net Proceeds of the Conrail Transfer inasmuch as the transfer was made free and clear of liens and encumbrances and the grantee did not assume Grantor's obligations under the Indenture. According to the Charge Trustee, his purpose was to obtain a ruling that the Indenture applies to the transfer, assuming that the ultimate proceeds would be at least $500,000 for the B & P properties involved, including the station complex.

After hearing, on March 22, 1978, Judge Fullam filed his Memorandum and Order No. 3470 rejecting the Charge Trustee's claim and indicating that, except for whatever might result from a *quasi cy pres* formula which he fashioned for possible benefit to CCBI holders, he was prepared to enter final judgment against the Charge Trustee. Judge Fullam reasoned that the deprivation of contingent benefit to the holders which the Rail Act might represent presented only a frustration by force of intervening law and not a default under the Indenture, nor an event to which the Indenture applied. At the Charge Trustee's request this Court took judicial notice of Judge Fullam's action and on May 10, 1978 issued its Order denying the Charge Trustee's request for instructions and characterizing Judge Fullam's Memorandum as careful and analytic. Because the *cy pres* element is not yet concluded, no final order on the above issue has been entered. But the Charge Trustee contends that no appeal has been contemplated in light of the reasoning in Judge Fullam's memorandum and its acceptance by this Court.

The *quasi cy pres* concept in substance states that CCBI holders would be permitted to share in proceeds of $500,000 or more received for B & P properties by Penn Central out of the Valuation Case in the Special Court created by the Rail Act which

either: (a) might reasonably have been expected to be sold so as to benefit the holders had the Rail Act not intervened, or which; (b) might prove to have passed pursuant to the Rail Act without thereafter continuing in rail use.

The Charge Trustee says that his investigation has revealed nothing which might qualify under part (a) of the above *cy pres* formula and only the Station Complex as a possibility under part (b). But he further claims that there is a very serious question of law which threatens likelihood of success on this claim, namely; do the transactions in this property constitute the required conveyance as defined?

The FSP called for transfer of the Station to the State of Rhode Island if it or one of its governmental agencies should elect to purchase it. The State so elected, allegedly intending to use the station and certain other property in conducting a commuter rail (i.e., non-rail) service, and the property was acquired by Rhode Island through its Department of Transportation (RIDOT). At the same time, the FSP gave Amtrak rights in the station property for use in its Northeast Corridor (long haul) passenger service between Boston and Washington (i.e., rail use). That service has been continuous since well before 1976 and is still continuing. And in reaching mutual agreement as to how RIDOT and Amtrak were to handle the property for their respective needs, they agreed that Amtrak should have a "perpetual easement equivalent to a fee" in the Station property with commensurate rights and obligations. That agreement was reached in 1977 and continued in force and effect at least through 1978, the year the equitable charge expired. The station is still used by Amtrak.

According to the Charge Trustee, these circumstances cast doubt that the B & P portions of the Station property have been devoted to non-rail use so as to qualify under Judge Fullam's *quasi cy pres* concept, the only way in which CCBI holders can benefit out of the Conrail Transfer.

In addition to the above, there are other issues that would involve litigation, such as questions of proceeds, title, and available uses.

The major legal issue remains, however, that if there has been no conveyance the *cy pres* concept cannot apply; if it cannot apply, no other aspect of the Conrail Transfer applies; and in that event it would follow that CCBI holders are not entitled to any share at all in whatever proceeds Penn Central may have received for its former B & P properties transferred under the Rail Act.

## II.  *The Severance Claim*

This claim has to do with a scattering of B & P parcels on different sides of the track from downtown Providence northward to the Boston Switch in Central Falls, Rhode Island which parcels escaped the Conrail Transfer, and the Readville Yard at the edge of Boston, a part of which also escaped the Conrail Transfer. The rest of the Massachusetts properties had been sold to the MBTA in 1973 to the CCBI holders' substantial benefit.

The claim is founded on the well established principle that upon a taking by eminent domain or similar public action the one whose property is taken is entitled to recover both the value of the taken property and any related damage caused to his remaining properties not included in the taking. The two elements together form companion parts of a single claim, in this case the Conrail Transfer Claim. As discussed above, Judge Fullam's Memorandum of March 22, 1978 limits recovery out of that transfer to whatever his *cy pres* concept might permit in light of relevant facts. It also mentions the possibility that severance damages might become pertinent.

The Charge Trustee claims that the remaining severed parcels have continued after the Conrail Transfer to be much as they were before 1976. They continued to represent the only properties not utilized in rail operations and they remained, as before, adjacent to the tracks for whatever advantage or detriment that might represent. The fact that the rail properties were now in different ownership is believed by the Charge Trustee to have no effect on the

value or possible uses of the severed parcels. Consequently, the Charge Trustee contends that he has not pursued the Severance Claim since the likelihood of any substantial recovery has seemed too remote.

### III. *The Consummation Claim*

On August 17, 1978 the United States District Court for the Eastern District of Pennsylvania issued its Opinion and Orders (Nos. 3707 and 3708) for Confirmation and Consummation of Plan of Reorganization and Final Decree. October 24, 1978 was fixed as the Consummation Date, a date about two months earlier than the expiration date of the equitable charge. In view of the presumed large value of former B & P properties which would pass under the plan to the Reorganized Company, the Penn Central Corporation, the Charge Trustee filed his petition in the Philadelphia Court seeking judgment in his favor for a very substantial award for the benefit of the CCBI holders.

The Penn Central plan provided that the Trustees transfer all their property to the Reorganized Company free and clear of liens, including the equitable charge, and that the Reorganized Company would receive the property without payment but with obligation to subject much of the property to new mortgages securing debts provided for in the plan. No provision was made in the plan for the Charge Trustee or the CCBI holders; yet the equitable charge would be extinguished two months before its proper expiration, despite the fact that it was the first and paramount encumbrance upon B & P property in the Trustees' hands.

In light of the issues of law involved in the Consummation Claim that would require solution within the intervening short time before October 24, 1978, the Charge Trustee's petition asked for steps permitting a considered resolution of its claim and assurance of post-Consummation funding with which to continue discharging its functions, without which CCBI holders would suffer wrong. These requests were granted after hearing on October 2, 1972 by Judge Fullam's Order No. 3789. That order directed that the equitable charge survive the Consummation as paramount permitted encumbrance on B & P properties and that the Reorganized Company enter into the Third Supplemental Indenture assuming all Grantor's obligations under the Indenture of Equitable Charge. It also reserved jurisdiction to continue with the Charge Trustee's pending Claims, which would proceed without prejudice by reason of the Consummation. The Third Supplemental Indenture was executed, is on file in this Court, and has been recorded in the appropriate registries of deeds in Massachusetts and Rhode Island. It, too, contained language establishing that its existence does not prejudice the Charge Trustee's pre-Consummation Claims.

According to the Charge Trustee the Consummation Claim has not progressed further in the Philadelphia Court due to the Charge Trustee's pursuit of discovery and the late 1980 announcement that the Penn Central's entire Valuation Case had been settled in the amount of $2.11 billion, to be paid to Penn Central on January 15, 1981. That settlement has been concluded. Charge Trustee claims that the settlement announcement, the foreseen difficulties of the Charge Trustee's pending claims, the significance for CCBI holders of further delays in a time of high market interest rates which continued litigation, conceivably involving appeal, all together prompted the Charge Trustee to reconsider settlement negotiations with Penn Central. The terms of settlement are as previously described: a settlement value of $1,000,000 in round figures, permitting payment of some $350,000 to the public CCBI holders.

According to the Charge Trustee the Consummation Claim, like the others, poses serious questions of law which must be decided favorably before success could be possible. In his memorandum, he analyzes them as follows.

Although the already confirmed Penn Central plan was modified to include the Charge Trustee's equitable charge, the nature and circumstances of the Consummation Transfer from the Reorganization

Trustees to the Reorganized Company are not clearly within the coverage of the Indenture according to the Charge Trustee.

In the first place, the Indenture is directed to transfers which result in proceeds whether by way of award or price, in any case a payment of funds, and they must be of qualifying amount. As stated above, the Penn Central plan provided there would be no payment to the transferring Trustees. Upon accomplishing the transfer they were to be left empty-handed and free of all further obligations.

Absence of any payment of proceeds in the Consummation can be countered, if at all, only by taking into account the Charge Trustee's assertions that the Grantor is in a fiduciary relationship toward and owes that duty to the Charge Trustee. The Indenture does not expressly contemplate such a relationship; but the Charge Trustee has based his assertions on a relative imbalance of resources and access to information claimed to favor the Penn Central parties over the Charge Trustee. Charge Trustee claims that he has asserted this repeatedly in Philadelphia but that the issue has never been discussed by that Court. It remains an open question.

At least equally difficult, according to the Charge Trustee, is the proposition that allowing the Charge Trustee's Claim would involve the Penn Central in an unjust and unintended double payment for the B & P properties. The Penn Central has apparently presented this argument to the Philadelphia Court in its memoranda of law, and the Charge Trustee believes that the eventual resolution of this issue could well be fatal to the Consummation Claim. According to the Charge Trustee, Penn Central's argument would be as follows. The Penn Central Trustees were authorized to purchase the B & P properties, and in consideration thereof to make substantial payment of money and to assume and discharge substantial mortgage obligations. The money was duly paid to the B & P Reorganization Trustee and distributed to the stockholders ($110 per share) and the New Bonds, issued to the United States under the B & P Plan and secured by mortgage, were paid in 1973 and the mortgage has been discharged. This price was paid out of trust funds, i.e., the Debtor's estate in the Trustees' hands. The Consummation is an event equivalent to the simple termination of a trust and distribution of the trust assets to the beneficiary. Were this reasoning held to be correct by Judge Fullam the Consummation Claim would be of little value to the CCBI holders.

The settlement represents one-half of what could be recovered if every claim were litigated successfully in favor of the Charge Trustee. This Court believes that the $900,000 amount is reasonable considering the serious legal obstacles to successful resolution of the claims as well as the inevitable expense and delay of continued litigation.

Were the claims to be litigated, for example, any recovery on the Claims which might be ordered would be awarded because of the Indenture and facts found to qualify under it. The recovered sum would constitute gross proceeds from which the Grantor would be entitled to deduct expenses as permitted in Article I, Section 8 and Article III, Sec. 5 of the Indenture. Only Net Proceeds would be paid over to the Charge Trustee under Section 1 of Article III. The Charge Trustee, in turn, is required by Article IV, Sec. 4 "forthwith" to distribute such Net Proceeds to all the CCBI holders "ratably in accordance with the fractional interest represented by each CCBI."

For purposes of illustration, only, let it be assumed that the gross maximum potential of the Claims is $2,000,000; that the Charge Trustee's chances of success on the law and facts are 45 percent and that permitted deductions are not over $270,000. On that basis the discounted gross proceeds would become $900,000; the total amount to be distributed to all CCBI holders, *including* the Penn Central as a holder, would be $630,000; and the ratable distribution to each of the 40,000 CCBI's would be $15.75. The proposed settlement will mean a fraction more, $16.86 for each publicly held CCBI. Penn Central will not share in the distribution as a CCBI holder.

The Charge Trustee asserts that after consultations with his counsel and following counsel's recommendations the Charge Trustee has concluded and still believes that his chances of success in pursuing further litigation might well not be as high as 45 percent. The issue of conveyance might well be ruled against him, and likewise the Charge Trustee might well lose on the unintended double-payment issue. If they were lost, there might well not be enough in severance damages to meet the minimum $500,000, even if they could be proved. For it is to be noted that the Penn Central's $2.1 billion settlement was reached, approved, and concluded without allocation of any amounts to any specific properties, whether those transferred under the Rail Act or those excluded. Further litigation of the disputed claims would obviously mean accrual of additional legal expenses thus increasing the deductions to be applied in reaching distributable Net Proceeds. This would work unfairly against CCBI holders.

The Development Group submitted objections to the compromise settlement on July 9, 1982. On July 21, 1982 the Charge Trustee responded to those objections. The Development Group replied to the Charge Trustee's responses on November 12, 1982; and the Charge Trustee filed a second response to the Group's replies on December 13, 1982. The Court turns now to these objections by the Development Group to the proposed compromise settlement which objections number 22 in all.

*Objection 1*

In its first objection the Development Group claims that Penn Central's offer has not been produced and explained. In its further elaboration upon this objection, the group gives past examples of situations involving the B & P, where initial compromise offers have been increased due to the Group's efforts.

The short answer to this contention is that in fact, the settlement has been explained in the Charge Trustees initial and supplemental memoranda, incorporated in the Court's opinion above.

The essence of the proposal is that the Penn Central, successor to the PC Trustees, the former Grantor against whom certain claims by the Charge Trustee once existed and now continue to exist without final decision against the successor, will pay to the Charge Trustee the sum of $350,182.20 and that the Charge Trustee will tender his release, disclaimer, and discharge of all claims which the Charge Trustee might assert against Penn Central under the Indenture as supplemented. This will happen upon the Court's final authorization of the Charge Trustee to receive the payment under the Indenture, for distribution to only the public CCBI holders.

There are subsidiary elements, such as the handling of distributive settlement moneys which cannot be delivered to the entitled holders, and Penn Central's alleged intention following authorization of the Charge Trustee to present the matter to Judge Fullam for his information in connection with terminating the litigation still pending before him under the Indenture. Judge Fullam, of the U.S. District Court for the Eastern District of Pennsylvania, as stated above, has exercised jurisdiction over the reorganization of the Penn Central Transportation Company and in that capacity has exercised jurisdiction over matters pending from time to time between the Charge Trustee and the PC Trustees, including the still pending claims described in the Charge Trustee's petition of February, 1981, and discussed in the Court's opinion, *supra,* namely, the Station Claim, the Severance Claim, and the Consummation Claim.

*Objection 2*

This objection has been withdrawn.

*Objection 3*

This objection deals with the 1973 composite sale to the Massachusetts Bay Transportation Authority. The Development Group claims that the B & P estate did not receive fair compensation for the sale of the West Roxbury Branch Railroad to the MBTA in that year.

In 1975 Penn Central Trustees, as successors to N.H. trusteeship, negotiated the sale

of B & P's West Roxbury Branch Railroad to MBTA as part of the sale that produced proceeds of $19,500,000. The Penn Central Trustees, acting as the fiduciary grantor for the B & P owners under the Indenture, allocated that price as follows among the three parcels: to Parcel A $11,500,000 was attributed; $5,000,000 was attributed to Parcel B, and; $3,000,000 was attributed to Parcel C. The Group's objection deals with Parcel B only. The Group claims that the sub-allocation of $500,000 to B & P properties sold to MBTA which are included in Parcel B, is inadequate. The Group seeks a ruling from the Court require an equitable allocation to the B & P trust fund of a sum much larger than $500,000. To support its contention the Group cites an appraisal made in 1965 by Wyer Dick & Company at the request of the B & P Trustee. Wyer Dick & Company appraised the B & P's Boston properties at $43,274,923. This appraisal, however, does not appear to have been admitted into evidence or otherwise evaluated by any Court.

On the other hand, at the request of the PC Trustees, Robert E. McGovern appraised all the properties to be included in the sale to MBTA. His appraisal, dated March 6, 1972, and supplemented April 20, 1972, assumed rail or highway use as the highest and best use for the property and set a fair market value for 4.04 miles of West Roxbury Branch from Forest Hills to the Dedham Town line at $663,000. Mr. McGovern testified at the May 2, 1982 hearing before Judge Fullam which led to the approval of the sale. If there were any objections to Mr. McGovern's qualifications, they should have been made to, and heard by Judge Fullam at that time, not eleven years later by this Court.

The West Roxbury line was included in Article I(B) of the agreement, along with other lines of New Haven and Old Colony railroads. The total price for these properties was fixed at $5 million. According to the Charge Trustee, the Charge Trustee accepted the sub-allocation of $500,000 for the West Roxbury Branch in light of all considerations affecting the overall sale including possible abandonment or long postponement. There is no persuasive evidence that the Charge Trustee did not meet its obligation as a fiduciary for the CCBI holders or that he did not protect their best interests. The allocation of money had the approval of Judge Fullam who was aware of the rights of CCBI holders to receive fair market value under the Indenture. The reasonableness of Judge Fullam's findings will not be reviewed by this Court. The Development Group accepted its distributive shares, and now wants this Court to suspend the statute of limitations, 11 U.S.C. § 205(b), so it can reconsider Judge Fullam's ancient ruling. I decine to so suspend the statute of limitations.

*Objections 4 and 5*

At issue in Group's objections 4 and 5 is the 1971 agreement between Amtrak and the PC Trustees. Pursuant to that contract the PC trustees agreed to operate passenger trains over their land and tracks (former B & P property), using their own equipment. The Schedules were to be agreeable to Amtrak and Amtrak agreed to pay the price for the service. The Group claims that this contract between Amtrak and the PC trustees was in fact an easement and that Amtrak was thereby required to assume certain obligations under the Indenture.

The Group contends that the Charge Trustee had an obligation under the Indenture, Article III, Section 9, to use his best efforts to effect a conveyance to the State of Massachusetts or the City of Boston, of B & P's main line from Back Bay to Readville via Forest Hills. The Group claims that: the 1971 Amtrak agreement was an easement; and that this easement was an excepted conveyance; which was unaccompanied by the required supplemental Indenture; and that this failure by Amtrak to assume obligations under the Indenture of Equitable Charge thwarted the closing of B & P's main line to the financial detriment of CCBI holders. The Group further claims that failure to close down B & P's main line frustrated the development of a second Park Avenue, joining along its axis the

bordering South End and Back Bay communities of Boston.

To fully address this objection a brief review of the purposes behind the Indenture of Equitable Charge is in order.

In approving the B & P Plan in 1966 the ICC stated:

The purpose of the CCBI's is to protect the interest of the Debtor's shareholders in the extraordinary gains which might be realized if, after the Debtor's properties are transferred to the New Haven or a successor, the properties, or any portion of them, were acquired for use in connection with mass transit programs, highway programs, highway construction, urban redevelopment or similar ventures.

*Boston & Providence R.R. Reorganization,* 327 ICC 10, 26–27 (1966). In approving the B & P Reorganization Plan, the Commission also stated:

The purpose of the CCBI's is to permit the public stockholders to share in potential windfalls on gains resulting from the sale of the Debtor's non-operating property . . . .

*Boston & Providence R.R. Reorganization,* 327 ICC at 22. And, as stated by this Court:

These provisions were included because of the potential value of certain portions of the Debtor's real estate, based on the price which would be received for this land if it should be sold or taken for highway or rapid transit purposes.

*In re Boston & Providence R.R.,* 260 F.Supp. 415, 419 (D.Mass.1966). And finally, the same view was expressed by the Court of Appeals for the First Circuit:

[The purpose of the CCBI's is] to allow further receipts for stockholders in the event that the potential for sale of real estate for non-railroad uses should be realized.

*In re Boston & Providence R.R.,* 413 F.2d 137, 140 (1st Cir.1969).

The Indenture of Equitable Charge was designed to carry out those intentions. Its obvious purpose was to make certain that the CCBI holders would participate in any benefits from major sales of surplus property which might occur on or before December 31, 1978, but not in sales after that date, and not in sale or other transactions involving conveyance of the long-haul rail lines of the B & P. Conveyance of B & P properties for rail and passenger use is an excepted conveyance under the terms of Indenture. To protect CCBI holders in case of such an excepted conveyance the drafters of the Indenture of Equitable Charge included three provisions, which must be interpreted together. (1) In defining the kind of conveyance the proceeds of which would inure to the benefit of the CCBI holders, all transfers to a carrier which would continue to be responsible for the operation of the long-haul service were specifically excluded; (2) any such carrier-purchaser would stand in the shoes of Penn Central and be subject to the obligations of the Indenture with respect to future transactions it might carry out, and; (3) if the succeeding carrier did not assume the obligations of the Indenture, the conveyance or transfer to such carrier would be null and void.

The Group's objections assume that the 1971 contract between Amtrak and PC Trustees is an easement. The granting of an easement involves the transfer of an interest in real estate, but the Group has produced no deed purporting to convey an interest in real estate from PC Trustees to Amtrak. Without a transfer of an interest in realty there can be no conveyance under the Indenture Article I, Section 5. Accordingly there is no excepted conveyance, no occasion for a supplemental Indenture, and no default in the grantor's performance of obligation or in the Charge Trustees fiduciary obligation to the CCBI holders.

The Development Group is suggesting by implication, or so it seems to the Court, that there has been collusion among Amtrak, PC Trustees, and the Charge Trustee directed at avoiding the duties and responsibilities triggered by a "transfer" of B & P properties. The Group implies that by contracting with Amtrak for rail service instead of conveying the B & P line outright to Amtrak,

PC Trustees provided Amtrak and themselves the opportunity to avoid financial responsibility to the CCBI holders in contravention to the mandates of the Indenture. The evidence of such collusion is simply not substantiated in the record, and the Court accordingly dismisses the objection without further comment.

*Objection 6*

In objection number 6, the Development Group contends that the office of Director of Development was undermined and rendered useless by the failure of the Charge Trustee to appoint an effective and on-going Director.

Article IV Sections 2 and 3 of the Indenture provide in pertinent part:

> The Charge Trustee shall retain a Director of Development for an initial term of two years commencing with the date of the consummation of the Plan . . . . The expenses and compensation of the Director of Development during such initial two-year term shall be paid . . . in the aggregate amount of $20,000 per year (but only as advanced by the grantor) . . . In the event that the Charge Trustee retains a Director of Development beyond the initial two-year term . . . it shall do so only on a contingent basis providing for payment of compensation and expenses at the aforesaid sale out of, and only out of, that portion of the net proceeds of Conveyances which shall be or become payable to the Holders of CCBI's other than the grantor . . .

The Charge Trustee did appoint a Director for an initial two-year term, April, 1971 to April, 1973; Mr. Fitzgerald, an attorney who had previously served as Commissioner of the Massachusetts Department of Public Works. The Development Group contends that Mr. Fitzgerald "served briefly to no visible office." (Group's Objection 6, July 9, 1982). The Group further contends that Mr. Rood should have had the job by virtue of his knowledge and experience with B & P affairs, as well as by virtue of an oral agreement between Mr. Rood and the New Haven Company, which was never reduced to writing.

The Group contends that before Mr. Fitzgerald was appointed director, the "Development Group Team" (Development Group Objection 6, July 9, 1982), consisting of Mr. Rood and others, was the *ad hoc* Director of Development, fulfilling the offices role as invisioned in the Indenture by vigorously pursuing financial gain for the CCBI holders. In light of the Development Group's stated belief that Mr. Rood was the only appropriate choice for the position of Director of Development, the Group suggests that it was a breach of the Charge Trustee's fiduciary duty to appoint Mr. Fitzgerald in Mr. Rood's stead.

The Court finds nothing improper about the Charge Trustee's actions. His choice of a Director was his choice to make and the Court will not belatedly impose an independent judgment regarding such factual issues as Mr. Fitzgerald's qualifications or potential for aggressiveness in pursuing CCBI holder interests.

The Charge Trustee's decision to discontinue the office of Director of Development after the initial two-year period was within his discretion according to the express terms of the Indenture, *supra.* He offered to the CCBI holders the option of raising funds to pay a salary so that the office of Director of Development could be continued beyond April of 1973, but he received neither a positive nor a negative response. In light of these circumstances, Charge Trustee's decision to let the office expire was not a breach of his fiduciary duty to the CCBI holders. Nor was it a breach of such duty for the Charge Trustee to reject Mr. Roods offer to serve as director of development *gratis.*

*Objection 7*

The Group's July objection number 7 focuses on "improvements" made by the Old Colony or New Haven railroads as lessee under the B & P lease, which the lease provided were to become the lessor's property without payment of compensation at termination of the lease, and which had been acquired of record by the lessee in its own name rather than that of B & P. The

objection was relatively brief and mentioned, more or less in passing, the Providence Terminal Agreement of September 13, 1935 (PTA), Northrup Yards in Providence, the South Boston Terminal easement, and the College Hill Tunnel. The Charge Trustee's brief July response, was that no "improvements" which escaped transfer to MBTA in 1973 or to Conrail in 1976 had otherwise been disposed of during the life of the equitable charge for sums sufficient to benefit CCBI holders under the Indenture formula. The one exception was the "improvements" transferred by the PC trustees in the course of the 1978 Penn Central Consummation, which is the basis of one of the Charge Trustee's claims included in the settlement. In his July response the Charge Trustee expressed his view regarding the South Boston Terminal easement, which had not been previously mentioned.

The Group's November reply is a departure from the original objection. It covers 20 pages and addresses numerous situations buck-shot style including: (a) aspects of the West Roxbury Branch and connecting lines in the Dedham-Needham-West Roxbury area; (b) uncertainty surrounding proceeds of the 1976 Rail Act transfer to Conrail due to the manner in which Penn Central's Valuation Case was settled in the Special Court, as well as the statutorily-mandated absence of a supplemental Indenture in connection with the Rail Act transfer; (c) suggestions of "hidden" B & P interests (e.g. PTA, the Tunnel, misrecordings, and in particular parcel A–19 in Providence); (d) alleged agreements and transfers involving Providence and Worcester Company; (e) vitality of possibilities regarding the Boston-Forest Hills-Readville main line, and; (f) carrier status of B & P in South Boston and unspecified significance of the requirement for equivalence of facilities.

In all, the objections and responses by the Charge Trustee and the Development Group cover approximately 33 pages. The Court will not paraphrase each individual claim, for upon examination of all the opposing contentions the Court finds that there is no substantial evidence that the Charge Trustee has not been diligent in identifying the B & P properties subjected to the equitable charge, and in tracking their disposition whether or not potential CCBI holder benefits appeared to be involved.

*Objection 8*

Development Group's objection number 8 is moot. The 1976 transition of PCTC, Debtor, from railroad to real estate company by reason of the Rail Act transfer did not involve a transfer, and consequently no possible conveyance, of the remaining non-rail real estate. Conveyance of the remaining property occurred in 1978 in the Consummation of the Penn Central Plan and that event is the basis of the Charge Trustee's Consummation Claim.

*Objection 9*

Development Group's July objection number 9 contends that the Charge Trustee places an absurdly low estimate, $730,000, on the compensable value of the B & P's portion of the Providence Union Station (the basis of Charge Trustee's Station Claim). As support for this contention, the Group points to a brief January 7, 1982 news article from the *Providence Journal* reproduced at 21A of Group's Objections, July 9, 1982, which reports a $126 million undertaking to relocate the downtown Providence Railroad tracks. This article has no probative value being rank hearsay.

There are two substantial flaws in the Development Group's arguments which render a meaningful discussion of its position futile.

The legally required date of valuation in the instance of the Station Claim is April 1, 1976, the date of the Conrail Transfer (the transfer of properties by the PC Trustees to Conrail pursuant to the Rail Act). A 1982 newspaper Article even if factual is not relevant to an appraisal of land value as that value existed in 1976.

Secondly, the Article makes no mention of how the part of the Station complex with which the Charge Trustee is concerned fits into the redevelopment. According to the Charge Trustee, the Old Station will survive as a historic landmark, which, if such is the case, will reduce its value significantly.

As to the Group's enlargement of objection number 9 in its November, 1980 reply, the Court holds that it is *res judicata.* The full Conrail transfer claim was finally disposed of in 1978 by Judge Fullam's memorandum.

*Objection 10*

Development Group's objection number 10 is redundant and has been dealt with under objection number 7.

*Objection 11*

In this objection, the Group alleges that the Charge Trustees evaluation of his claims has been too low, because accumulated interest from April 1, 1976, or other possibly applicable date, has not been included in the Charge Trustee's calculation of his claims.

The Charge Trustee's claim for accrued interest is only one bargaining tool among others that the Charge Trustee had at his disposal in coming to a compromise with Penn Central. The fact that the Charge Trustee used or failed to use that particular tool does not detract significantly from the reasonableness and fairness of the compromise settlement as a whole.

*Objection 12*

In the Development Group's objection number 12, the Group claims that Penn Central must pay over its 48 percent of the proposed compromise settlement to the Charge Trustee and that according to the terms of the Indenture the Charge Trustee will then return Penn Central's 48 percent to Penn Central *pro rata* as a CCBI holder.

Under the proposed compromise settlement as it stands, the sum payable to Penn Central as a CCBI holder will not be paid into the Shawmut's trust fund for the B & P stockholders. Penn Central will retain the amount to which it is entitled and pay the remaining sum, approximately 52 percent, to the Charge Trustee for distribution to the remaining public CCBI holders.

The Development Group claims that this "short cut" violates the Indenture and, "represents a crafty attempt on someone's part to deny fair reimbursement and *pro rata* contribution to the Development Group's expenses and to proper administra-

tion of the Boston and Providence remaining estate." Development Group Objection 12, July, 1982.

The gist of the Group's objection, then, is that the proposed method of disbursement of funds both violates the Indenture, and places Penn Central's share beyond the reach of the Development Group which will seek to place a lien upon it to satisfy their claims for allowances.

Article IV, Section 4 of the Indenture provides that:

The Charge Trustee shall receive all Net Proceeds ... in trust for distribution .... Upon receipt from time to time of any amount of such Net Proceeds, the Charge Trustee shall forthwith cause them to be paid over to the Holders, ratably in accordance with the fractional interest represented by each CCBI ...

This article of the Indenture directs that the Charge Trustee distribute Net Proceeds, minus the appropriate deductions to the CCBI holders *pro rata,* forthwith, and without further deductions of any kind.

The entire function of this Indenture provision is to expedite the flow of Net Proceed funds to entitled CCBI holders. Article IV, Section 4, does not provide for payment of legal fees nor can it be liberally interpreted to embrace such claims. Provision for payment of legal fees is specifically drafted into Paragraph 12 of the Plan of Reorganization. Paragraph 12 provides for establishment of the $550,000 fund out of which allowances payable after April 1, 1971 are to be paid, and it reserves jurisdiction to consider claims for such allowances while expressly terminating jurisdiction to alter in any way the rights of CCBI holders.

In light of this brief analysis, the Court holds that the technical deviation from the strict terms of the Indenture does not undermine the spirit of the Indenture, nor does it subvert the Indenture's purpose. It is accordingly an allowable departure from the strict mandates of the Indenture.

*Objection 13*

Arbitration is not at issue here so the Court will not consider Group's objection number 13.

*Objections 14, 15, and 16*

Objections 14, 15, and 16 all rest upon the rule of absolute priority of creditors claims over stockholders' rights in reorganization as a basis for withholding approval of the settlement proposal. The Court has addressed the Development Group's claims for allowances in its Memorandum and Order dated October 26, 1982, and will not further readdress the issue.

*Objections 17 through 22*

Objections 17 through 22 are not substantive claims and do not add significantly to an analysis of the fairness and equity of the proposed settlement.

In sum, having evaluated the further facts and issues provided in the Charge Trustee's three memoranda, and having studied the numerous objections submitted by the Development Group, this Court reiterates its prior ruling that the compromise settlement is prudent, fair, and equitable, and is in the best interest of the CCBI holders. Litigation must end sometime. The rule against perpetuities still lives!

Order accordingly.

### ORDER

AND NOW, upon consideration of the PETITION OF SHAWMUT BANK OF BOSTON, N.A., CHARGE TRUSTEE UNDER INDENTURE OF EQUITABLE CHARGE DATED APRIL 20, 1971, AS SUPPLEMENTED, (INDENTURE) FOR AUTHORITY TO SETTLE OUTSTANDING CLAIMS FOR BENEFIT OF HOLDERS OF CERTIFICATES OF CONTINGENT BENEFICIAL INTEREST (CCBI'S), AND FOR FINAL DISCHARGE OF SAID BANK FROM FURTHER OBLIGATION AND LIABILITY AS SUCH TRUSTEE, and the hearing held with respect thereto:

THE COURT FINDS that the compromise settlement and discharge of all claims of the Charge Trustee now pending or which might hereafter be asserted against the Penn Central Corporation (Penn Central), successor Grantor under the Indenture of Equitable Charge (Indenture), dated April 20, 1971, executed herein in accordance with the Plan of Reorganization (Plan), against receipt by the Charge Trustee of payment by Penn Central to it of $350,182.20 for distribution to the Holders of Certificates of Contingent Beneficial Interest (CCBI's) issued pursuant to the Plan, other than Penn Central as such a holder, and the distribution of such sum to the holders other than Penn Central, at the rate of $16.86 for each former share of stock of Boston and Providence Railroad Corporation represented by CCBI's owned of record by the recipient holders of record as of _____, 1983, is prudent, fair, and equitable, and in the best interests of the recipient holders.

THE COURT FURTHER FINDS that, upon completion of such settlement and distribution, no funds will remain in the hands of either Penn Central, Grantor under the Indenture, or the Charge Trustee which might be distributable to or for the benefit of CCBI holders and that, the lien of the equitable charge having expired on December 31, 1978, the purposes and intent of the Indenture will have been fully and finally satisfied and discharged and the fiduciary obligations of the Charge Trustee in favor of CCBI's will have been fully and faithfully paid, observed and performed without further obligation or liability to any persons on account of, arising out of, or in any way connected with its acceptance and performance of its trust under the Indenture, and that the Charge Trustee should be fully and forever released and discharged therefrom.

ACCORDINGLY, IT IS ORDERED:

1. The compromise settlement and the discharge of all claims as aforesaid are hereby approved and authorized, and the Charge Trustee is directed to accept and receipt for the sum of $350,182.20 to be paid to him by Penn Central and to make distribution thereof to holders of CCBI's other than Penn Central consistently with the foregoing findings;

2. Any distributive payments to holders of CCBI's other than Penn Central which for any reason cannot be completed within sixty (60) days after the date of distributive

mailing to those holders shall be delivered by the Charge Trustee to Penn Central and thereafter holders of CCBI's shall be entitled to look only to Penn Central for payment of their certificates;

3. The Indenture is declared to be fully satisfied, expired, terminated, and forever discharged for all purposes, subject only to consummation of the aforesaid settlement and distribution and to Penn Central's payment of all compensation and expenses of the Charge Trustee and the Director of Development for which it is obligated under the Indenture through final settlement of such accounts between the Charge Trustee and Penn Central relating to the Indenture and the Charge Trustee is directed to proceed to such settlement at the earliest practicable time;

4. Subject only to the matters set forth in paragraph 3 of this Order the Charge Trustee is hereby fully and finally released and forever discharged from all his trusts and duties under the Indenture free of all obligation and liability to any persons on account of, arising out of, or connected with his acceptance and performance of his trusts and duties under the Indenture;

5. After 45 years this matter is terminated hereby. No further filings will be accepted or acted on.